James Cunningham *vs.* James Munroe, Administrator.
Enoch Train & another *vs.* Same.

A superintendent of alien passengers, accompanied by a police officer for the purpose o enforcing obedience to his orders, went upon a vessel arriving with alien passengers on board, and demanded head money on these passengers, under color of his office but without lawful authority; told the master that if he did not comply with the demand he could not land his passengers; and gave him a receipt in behalf of the Commonwealth for the head money, which by arrangement between him and the master was actually paid after the landing of the passengers. The vessel could not have been entered at the custom-house without a certificate from the superintendent that the head money had been paid, or a satisfactory arrangement made with him for its payment. *Held,* that the payment was by compulsion, and that the owner of the vessel might maintain an action to recover it back from the superintendent while remaining in his hands, whatever was the contract as to head money between him and his passengers. The money having been deposited in a bank by the superintendent in his official capacity and not mingled with his own property, and he having died pending the action, no creditor having required that it should be included in his general assets, and it having been paid over by

his administrator to the Commonwealth upon receiving a bond of indemnity, *Held,*
*further,* that the representation of his estate as insolvent, and the appointment of com-
missioners of insolvency by the probate court, did not oblige the plaintiff to prove his
claim before the commissioners, or prevent his prosecuting his action to judgment against
the administrator.

An assignment of one partner's estate under the insolvent laws does not prevent all the
partners from maintaining an action previously commenced on a debt due to the part-
nership.

Two ACTIONS OF ASSUMPSIT for money had and received,
brought in June 1849 against "Jotham B. Munroe of Boston, in
the county of Suffolk, superintendent of alien passengers," and
the Merchants' Bank as his trustees. At the first term the defend-
ant appeared, and on his motion the plaintiffs filed bills of par-
ticulars for head money on alien passengers by various vessels,
paid by the plaintiffs to the defendant at different times since
the 1st of January 1849, with interest. The defendant died
intestate in February 1853, and at November term 1853 his
death was suggested. At March term 1854 the plaintiffs dis-
continued against the trustees, and the defendant's administra-
tor was summoned in, and at November term 1854 appeared
and assumed the defence of the actions. The cases were re-
ferred to an auditor, and, after the return of his report, were
tried together before *Hoar,* J., who by agreement of parties
withdrew them from the jury and reserved them for determina-
tion by the full court, with power to draw such inferences and
conclusions as a jury might from the evidence, which was in
substance as follows:

During the time in question, the intestate held the office of
superintendent of alien passengers in the city of Boston, under
the *St.* of 1848, *c.* 313; and under that statute demanded and
exacted of the plaintiffs the money sued for, as and for head
money on alien passengers who arrived at Boston from the Brit-
ish provinces in North America in vessels owned by the plaintiff
in the first action, or from Great Britain or Ireland in vessels of
which the plaintiffs in the second action were either owners or
part-owners and agents or charterers; and signed and gave to
the plaintiffs receipts in writing, bearing date of the day of
the arrival of the vessels, and acknowledging himself to have

"received for the State of Massachusetts" such head money. For the mutual convenience of the parties, it was arranged between him and the plaintiffs, as well as between him and the owners of other vessels, that the payment of head money might be deferred until after the landing of the passengers; the plaintiffs and other owners agreeing to pay when called on, and the superintendent relying on their honor and good faith for the fulfilment of their agreement, and afterwards collecting the head money at his convenience or the mutual convenience of the parties. All the payments were made by the plaintiffs under protest, as appeared by indorsements made by the superintendent on the receipts on the days of actual payment. Until the head money was paid, or arrangements for paying it made to the satisfaction of the superintendent and his certificate shown to the custom-house officers, no vessel arriving at the port of Boston with alien passengers on board for whom payment of head money was claimed by him could be entered at the custom-house; the collector of the port, after an interview with the superintendent, having given directions to that effect.

In the first case, it appeared that there was no law requiring a license to be taken out in the provinces from which the plaintiff brought his passengers; that the plaintiff fixed the passage money without reference to head money, and charged a uniform price for all passengers of the same class, whether aliens or American citizens; and that on some trips the passage money of such passengers was actually less than the head money which the plaintiff was required to pay on each alien passenger.

In the second case, it appeared that by *St.* 5 & 6 Vict. *c.* 107, § 19, any owner, charterer or master of a ship, or any passage broker, agent or other person, receiving money from any person for or in respect of the conveyance of any person as a passenger from the British dominions to any port or place in North America, was required, under a penalty, to give a written acknowledgment of having received a sum named in full payment for the passage, "including head money, if any, at the place of landing, and every other charge;" that the plaintiffs gave such an acknowledgment to all the passengers for whom

they paid head money to the intestate, and had taken out a license under § 20 of that statute as "passage brokers," and, in fixing the amount of passage money to be paid by the passengers, included an item of two dollars for head money; and that in one or more instances head money was refunded by the plaintiffs to passengers for whom head money was not chargeable under the statute of Massachusetts.

In both cases, William B. Tarleton, a police officer in Boston, testified as follows: " From May 23d 1848 to June 1849 I acted as assistant to Mr. Munroe to board vessels, and assist in the inspection of passengers. I always went with him. My instructions from him were to get every one on deck, and keep them till inspected. We had the same rule as to all vessels, whether they came from Nova Scotia or England. The pilots were under Mr. Munroe's order. We boarded vessels day and night. For all that looked well, smart, active folks, we asked two dollars a head; for the sick, lame, blind, we took a bond. Mr. Munroe decided as to those two classes. Sometimes he conferred with the physician. I never knew a bond required for the well; they paid head money according to his instructions. We drew a line across by the mainmast, and called the names over from the list furnished by the agent or owner of the vessel, whose clerk would be there, and if there was any doubt, he would set them aside, and would look at them again and require a bond, if necessary. It was the same as I have stated as to all the vessels. The same rule after May 1848, as before for one class we required two dollars, for the other a bond. Munroe always told the captains the law of the State and city, and that they must comply with the law or they could not land their passengers. We had printed copies of the law, which we gave to the captains. I was directed to notify the pilots, and did so, and they complied with the law. By his directions, I kept four passengers on board one vessel. In quite a number of cases the law was resisted, or not observed, but he never allowed the law to be disobeyed. He enforced obedience in all cases where there was resistance. My orders from him were not to allow any one to land until head money was paid, or

bond signed. I read a copy of the law that nobody was to land until payment. I have kept a number on board, and in some cases I have sent away vessels with the passengers on board. I have put passengers below at night; called police force to assist, and they did assist."

The Merchants' Bank, summoned as trustees, had at the time of the service of the writs upon them in these actions the sum of $ 13,800.43 deposited with them to the credit of "Jotham B. Munroe, superintendent of alien passengers." The inventory of the intestate's estate consisted of personal property of the value of $ 160.12, and no real estate. The administrator, in his first account, which was allowed by the probate court on the 27th of March 1854, charged himself with the amount of the inventory and with "sums received, $ 15,518.07," of which the principal item was the sum so deposited; and credited himself with "sundry payments made, $ 13,951.44," one of which was "paid to Jacob H. Loud, treasurer of the Commonwealth of Massachusetts, the amount of deposit in the Merchants' Bank, agreeably to a resolve of said Commonwealth in 1854, $ 13,800.43," which was actually so paid. Pursuant to the resolve of 1854, *c.* 17, the treasurer of the Commonwealth executed a bond to the administrator to indemnify him and the estate of his intestate against the demands of the plaintiffs in these actions, and in consequence of his having so paid over said sum of money.

On the 17th of July 1854 the administrator represented to the probate court that the estate of his intestate was insolvent, and commissioners were appointed to examine claims, who afterwards made their report to that court, which on the 21st of May 1855 allowed a second account of the administrator, and ordered the balance thereof, amounting to $ 678.15, to be distributed among the creditors whose claims had been allowed, making a dividend of nearly fifty per cent. No application was made to this court for a continuance of the actions without costs under the Rev. Sts. *c.* 68, § 19; nor was any suggestion made of record that the estate of the intestate was insolvent or had been so represented in the probate court; nor was any

application made by either party to the probate court to keep open the proceedings before the commissioners of insolvency until a decision should be made in these cases; nor did the plaintiffs present their claims to the commissioners for allowance.

Pending the second action, the plaintiff Train became insolvent, and applied for the benefit of the insolvent laws, and his estate was assigned to assignees in insolvency.

The auditor reported that the plaintiffs in each case were entitled to recover so much of the head money paid by them to the intestate as had not been paid over by him to the Commonwealth before his death.

*B. R. Curtis*, for Cunningham, and *B. F. Brooks & G. O. Shattuck*, for the other plaintiffs, cited some of the cases referred to in the argument of *Cunningham & Woodward* v. *Boston, ante*, 470, 471, and also *Unwin* v. *Leaper*, 1 Man. & Gr. 747; *Dew* v. *Parsons*, 2 B. & Ald. 562; *Oates* v. *Hudson*, 6 Exch. 346; *Astley* v. *Reynolds*, 2 Stra. 915; *Townshend* v. *Dyckman*, 2 E. D. Smith, 224; *Marriott* v. *Hampton*, 2 Smith's Lead. Cas. & notes; 22 Law Reporter, 13; *Cooley* v. *Wardens of Philadelphia*, 12 How. 435.

*S. D. Parker*, for the defendant. 1. The *St.* of 1848, *c.* 313, § 5, avoids the objections upon which the *St.* of 1837, *c.* 238, § 3, was held unconstitutional in *Norris* v. *Boston*, 7 How. 283, by authorizing a bond to be taken in all cases, and permitting the payment of head money as a voluntary commutation.

2. The payments by the plaintiffs were voluntary payments, made under no mistake of facts, no duress of person or property, and no compulsion. The plaintiffs could lawfully resist the claim, and had the means to defend against it, and the superintendent could not enforce it. See cases cited for the defendant in *Cunningham & Woodward* v. *Boston, ante*, 470, from which these cases are not distinguishable. The refusal of the collector to enter vessels at the custom-house until the police laws of the State had been complied with was his own act, authorized by the U. S. St. of 1799, *c.* 101, and not a coercion by the intestate.

3. The intestate received no money to the use of the plain

tiffs. It was the money either of the passengers or of the Commonwealth. Having acted as a public officer, well known and recognized, and so stated in the receipts which he gave, he could not be held personally liable to an action. *Gilmore* v. *Pope*, 5 Mass. 491. *Hodgson* v. *Dexter*, 1 Cranch, 363. *Macbeath* v. *Haldimand*, 1 T. R. 72. *Commonwealth* v. *Phœnix Bank*, 11 Met. 137. The money was not assets in the hands of his administrator. *Bradford* v. *Rowe*, 3 Pick. 17.

4. If he was personally liable in his lifetime, the proceedings in the probate court and under the commission of insolvency bar this action against his administrator. *Paine* v. *Nichols*, 15 Mass. 264. *Todd* v. *Bradford*, 17 Mass. 567. *Bordman* v. *Smith*, 4 Pick. 212. *Johnson* v. *Ames*, 6 Pick. 330. *Bullard* v. *Dame*, 7 Pick. 239. *Healy* v. *Root*, 11 Pick. 389.

5. The plaintiffs received the head money from the passengers and paid it to the intestate, acting as brokers under a British license. See *Sts.* 5 & 6 Vict. *c.* 107; 10 & 11 Vict. *c.* 103; 11 Vict. *c.* 6; 12 & 13 Vict. *c.* 33. Having received the money from these passengers for the purpose of paying it over if required, and having paid it under a law of the State which had been declared by this court to be constitutional, they cannot now deny the right to demand it. *King's Chapel* v. *Pelham*, 9 Mass. 501. Upon paying it according to the contract with their passengers, the plaintiffs' relations to the passengers ceased, and they had no right to recover it back in their own names.

6. In the second case, the insolvency of Train dissolved the copartnership, and his assignees in insolvency refusing or neglecting to come in and prosecute, the action cannot be maintained by his copartner alone.

By the Court. 1. It is unnecessary to consider the question of the construction of the *St.* of 1848, *c.* 313, § 5; for if it conferred an authority absolutely to demand head money of any alien passengers, as the plaintiffs contend that it did, it was unconstitutional, within the decision of the supreme court of the United States in *Norris* v. *Boston*, 7 How. 283, which this court is bound to follow; and if, as the defendant contends, it merely gave the plaintiffs the option to pay head money instead of

giving bond, the superintendent did not comply with it, as the facts show that he peremptorily required payment of the head money now sought to be recovered. In either aspect, therefore, the head money was unlawfully exacted by him of the plaintiffs.

2. The facts in these cases show that the money was paid under duress. The actual and frequent declarations of the superintendent of alien passengers, with the aid of police officers, that passengers should not be landed until the head money was paid, the refusal to enter the vessels at the custom-house until the assent of the superintendent had been obtained, and the other measures which the evidence shows to have been resorted to in order to enforce payment, clearly prove duress *de facto;* and the money having been paid under a demand made by a public officer *colore officii* with the menace of coercion and the present means of enforcing that menace, the payment was not voluntary. The cases are thus distinguished from those of *Cunningham & Woodward* v. *Boston, ante,* 468.

3. The fact that the superintendent was a public officer, and receipted for the money as such, did not protect him from an action. The money might therefore have been recovered back from him in his lifetime.

4. The proceedings in the probate court and before the commissioners of insolvency after the estate of the deceased had been represented insolvent do not bar these actions. He received the money in his capacity as superintendent of alien passengers, and gave receipts for it as such; and he deposited it in a bank separate and apart from his other moneys, clearly indicating an intention on his part to treat it as money held by him on a specific trust, and not as belonging to himself or to be mingled with his own property. Under such circumstances, the administrator was not bound to bring it into the general assets of the estate, and no creditor ever required that it should be included in the general assets. It would have belonged to the Commonwealth if lawfully collected; and, having been unlawfully collected, it belonged to those from whom it had been exacted by the intestate. The plaintiffs were not bound to

Cunningham & others *v.* Munroe, Administrator.

prove their claims before the commissioners of insolvency, be-cause they brought these actions against the intestate in his lifetime, and have since duly prosecuted them against his admin-istrator. They are therefore entitled to prosecute the actions to final judgment and obtain payment out of the separate fund.

5. These actions may be maintained by the parties from whom the money was unlawfully exacted, and it is immaterial whether they will be accountable in their turn to the passengers from whom they received it.

6. The assignment in insolvency of Train's estate did not extend to partnership assets, nor to debts due to the firm. *Fern* v. *Cushing*, 4 Cush. 358. The two partners may therefore main-tain their action, whatever may be the proper distribution of any money that they may recover.

The result is, that the plaintiffs are entitled in each case to recover against the estate of the intestate the amount found due by the auditor.

*Judgments for the plaintiffs accordingly.*

MEMORANDA.

On the twenty-first day of August 1860, Chief Justice SHAW resigned the office of chief justice of this court, which he had held since the thirty-first day of August 1830.

On the seventh day of September 1860, Mr. Justice BIGELOW was appointed chief justice, in place of Chief Justice SHAW, resigned, and took his seat upon the bench as such on the eleventh day of September, at the term of the court then held at Boston in the county of Suffolk.